

One Logan Square
130 North 18th Street | Philadelphia, PA 10103

| | |
|---|---|
| *Phone:* | *+1 (215) 569-5624* |
| *Fax:* | *+1 (215) 832-5624* |
| *Email:* | *joseph.poluka@blankrome.com* |

July 23, 2025

The Honorable Keli M. Neary
United States District Judge
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

   Re: *United States v. Dennis R. Smith, III*
      Criminal No. 1:06-CR-00369

Dear Judge Neary:

  We write to respectfully bring to the Court's attention a significant recent decision from the United States Court of Appeals for the Second Circuit, *Johnson v. United States*, No. 24-1221, decided on July 17, 2025, which supports the arguments advanced in Dennis Smith's ("Smith") Petition for Writ of *Coram Nobis* and accompanying briefing. A copy of the *Johnson* decision is enclosed for the Court's convenience.

  In *Johnson*, the Second Circuit granted a petition for *coram nobis* relief, vacating the petitioner's conviction after determining that the jury instructions included a now-invalid legal theory. The court found that the inclusion of the invalid theory was not harmless and that the petitioner continued to suffer legal consequences from his conviction, thus warranting the extraordinary remedy of *coram nobis*. The court emphasized that *coram nobis* is appropriate where a petitioner is no longer in custody, but continues to face collateral consequences from a conviction that is invalid under current law.

  The *Johnson* decision is particularly relevant to Smith's case for several reasons:

  1. *Grant of Coram Nobis Relief Post-Finality*: The Second Circuit reaffirmed that *coram nobis* relief is available to correct fundamental errors in criminal convictions, even long after the sentence has been served, where the conviction rests on non-criminal conduct.

  2. *Continuing Collateral Consequences*: The court recognized that ongoing legal and professional disabilities resulting from a conviction may satisfy the requirement for collateral consequences, a point we have raised in our filings regarding the impact of Smith's conviction.

     3. *Change in Law as a Basis for Relief*: *Johnson* confirms that a substantive change in the law—such as the Supreme Court's decision in *Snyder v. United States*, which clarified the scope of 18 U.S.C. § 666—provides a sound reason for not seeking relief earlier and justifies *coram nobis* relief when a conviction is based on non-criminal conduct.

     4. *Harmlessness and Fundamental Error*: The Second Circuit's analysis in *Johnson* underscores that when a conviction may have rested on an invalid legal theory, and there is grave doubt as to whether the jury would have convicted on a valid theory alone, the error is not harmless and relief is warranted.

     This recent appellate authority further supports Smith's position that his conviction, which was predicated on non-criminal conduct under *Snyder*, should be vacated through *coram nobis*. The *Johnson* decision, issued after our filings, demonstrates that federal courts continue to grant *coram nobis* relief in analogous circumstances, reinforcing the appropriateness of such relief in this case.

     We respectfully request that the Court consider the *Johnson* decision as additional persuasive authority in support of Smith's pending Petition for a Writ of *Coram Nobis*.

     Thank you for your attention to this important development.

     Respectfully,

     JOSEPH G. POLUKA

JP:gg

cc: Carlo D. Marchioli, Assistant U.S. Attorney

Enclosure

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

_____

August Term 2024

Argued: March 18, 2025<br>Decided: July 17, 2025

No. 24-1221

_____

MARK JOHNSON,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

On Appeal from the United States District Court<br>for the Eastern District of New York, Garaufis, *J.*

_____

Before:      CALABRESI, NATHAN, and KAHN, *Circuit Judges.*

Petitioner-Appellant Mark Johnson appeals from a judgment of the United States District Court for the Eastern District of New York (Garaufis, *J.*) dismissing his Petition for a writ of coram nobis. Johnson was convicted in a general verdict after the government presented two theories of fraud to the jury, one of which was

the now legally invalid right-to-control theory. Below, the government opposed his Petition on the grounds that the jury, in effect, also convicted Johnson on the legally valid misappropriation theory, rendering harmless the erroneous presentation to the jury of the right-to-control theory. We find that the government's case against Johnson under the misappropriation theory is comparatively weak and have grave doubt that the presentation to the jury of the right-to-control theory was harmless.

Accordingly, we REVERSE the district court judgment and REMAND for entry of an order granting the Petition.

————————————————————————

> ALEXANDRA A.E. SHAPIRO, (Jason A. Driscoll, *on the brief*), Shapiro Arato Bach LLP, New York, NY *for Petitioner-Appellant*.
>
> ANDREW W. LAING, Appellate Counsel, Criminal Division, Fraud Section (Lisa H. Miller, Deputy Assistant Attorney General, *on the brief*), *for* Nicole M. Argentieri, Principal Deputy Assistant Attorney General, Department of Justice, Washington, DC *for Respondent-Appellee.*
>
> (Jacqueline Jamin Drohan, Vivian Rivera Drohan, Drohan Lee LLP, New York, NY *for Amicus Curiae* ACI – The Financial Markets Association, *in support of Petitioner-Appellant.*)

————————————————————————

CALABRESI, *Circuit Judge*:

Petitioner-Appellant Mark Johnson served two years in prison for wire fraud and conspiracy to commit wire fraud. Johnson filed this Petition seeking a writ of coram nobis after the Supreme Court's decision in *Ciminelli v. United States*,

1    598 U.S. 306 (2023), rendered legally invalid one of the two theories of fraud

2    liability presented to his jury which returned a general verdict convicting him. The

3    government argued that submitting the invalid theory was harmless because

4    Johnson was also convicted under the valid, alternate theory of fraud—

5    misappropriation. The government's misappropriation case against Johnson was

6    weak. And we think it very unlikely that it was an independent basis for Johnson's

7    conviction. We therefore REVERSE the district court decision and REMAND for

8    the district court to GRANT the Petition.

9    **BACKGROUND**

10    Mark Johnson was convicted in 2017 by a jury in the Eastern District of New

11    York of wire fraud and conspiracy to commit wire fraud. The charges centered on

12    a transaction Johnson conducted in 2011 as global head of HSBC's foreign

13    exchange trading desk, in which HSBC converted U.S. Dollars into 2.25 billion

14    British Pounds for the oil and gas company Cairn Energy. The details of the case

15    have been discussed extensively before, both by this Court, *United States v. Johnson*,

16    945 F.3d 606, 608–12 (2d Cir. 2019), and by the district court, *Johnson v. United*

17    *States*, No. 23-CV-5600 (NGG), 2024 WL 1740916 at *1–5 (E.D.N.Y. Apr. 23, 2024).

1   We therefore restrict our discussion to the, still lengthy, facts most pertinent to the

2   present decision.

*The Foreign Exchange Market*

4      The foreign exchange (FX) market is a decentralized market for the trading

5   of currencies. Unlike the stock market, it does not have a closing price. Instead,

6   banks and financial services companies publish a "fix"—a benchmark exchange

7   rate for each pair of currencies being traded. The relevant actors here used World

8   Market/Reuters (WM/Reuters), which publishes its fix rate hourly, based on the

9   average price of actual trades executed in a one-minute window beginning 30

10  seconds before the hour and ending 30 seconds after the hour. Movements in

11  exchange rates are measured in "pips," 100 pips being equivalent to one cent.

12     FX dealers, usually banks, can act as agents or principals. When a dealer acts

13  as a client's agent, the dealer functions as a middleman and trades with a third

14  party on behalf of the client. For example, if a client wants to purchase pounds, the

15  dealer, for a fee, will find a seller with the best price and purchase pounds on

16  behalf of the client.

17     In contrast, when a dealer acts as a principal, the dealer transacts directly

18  with the client to sell currency from its own inventory. There are multiple ways to

1   structure transactions in which dealers act as principals. In a full-risk transfer, the

2   dealer and client agree upon a set exchange rate, and the dealer sells the currency

3   to the client at that rate. The dealer therefore bears the risk that the market value

4   of the currency will change after the deal is made. In other words, it risks

5   purchasing currency at a higher price than the price at which it agreed to sell. To

6   compensate for that risk, the dealer charges the client a fee for executing the

7   exchange.

8        On the other hand, in a fix transaction, the dealer agrees to sell currency to

9   the client at a rate determined by the "fix" at a specific time set in the future. For

10   publicly held clients, this method offers transparency: a corporation can show its

11   shareholders that it received the market rate based on the fix. The dealer usually

12   does not charge a fee for a fix transaction. Instead, it attempts to profit by "beating

13   the fix"—that is, by purchasing the currency at a price below the fix rate at which

14   it will sell the currency to the client.

15        A dealer in a fix transaction must first buy sufficient currency to fulfill the

16   order. Ideally this is done slowly, in the several hours leading up to the transaction.

17   This accumulation of the currency in anticipation of the fix is called "pre-hedging,"

18   and it helps protect against last-minute spikes in the price of the currency. If the

1    market catches on to the dealer's intentions and realizes the dealer needs to

2    purchase, for example, several billion pounds, the market price of pounds will rise.

3    If a dealer buys currency in an aggressive manner just before a fix, this may lead

4    to an increase of the fix price, thereby inflating the price the client must pay and

5    with it the dealer's potential profits.  Doing this intentionally is referred to as

6    "ramping" the fix. In any case, the dealer looks to purchase the currency in a fix

7    transaction at a price lower than what it predicts the eventual fix price to be.

8        A dealer may also purchase currency for its own proprietary accounts and

9    aim to sell to third parties immediately after the fix transaction, anticipating that

10   the fix transaction itself may cause a momentary spike in the price of the currency

11   from which it can profit. This is called "trading ahead." The line between pre-

12   hedging and trading ahead is, however, necessarily blurry because dealers simply

13   do not know how many pounds, for example, they must buy to fulfill the client's

14   order until they see the final fix price. If dealers purchase too much currency, they

15   will seek to sell it at the high point after the transaction, and if too little, they may

16   have to reach into their own proprietary accounts to fulfill the order.

17       In the retail context, where dealers purchase currency entirely on their

18   client's behalf as their agent and receive a commission, pre-hedging or trading

ahead is called front-running and is illegal. Dealers making such transactions on behalf of a client are not allowed to use the knowledge that the transaction may move the market to make a profit by making parallel trades in their own proprietary accounts. In principal-to-principal transactions, where dealers do not receive a commission, such conduct is, instead, explicitly not regulated. Indeed, pre-hedging and trading ahead is how banks profit and manage their own risk in FX transactions where they do not charge a commission.

*The Contract Negotiations*

In October of 2011, Cairn Energy sent a Request for Proposal (RFP) to nine major banks. Cairn planned to sell its subsidiary in India for around $4 billion, convert those dollars to British pounds, and pay out the proceeds to its shareholders. Cairn had never before been involved in an FX transaction of that size, and it sought proposals from banks about how to conduct the trade. Cairn retained the London investment bank Rothschild & Co. as its financial advisor, and Rothschild ran the RFP process. Each bank invited to participate in the process was required to sign a Non-Disclosure Agreement (NDA) stating that "[c]onfidential [i]nformation" was being provided "solely for the purposes" of "assist[ing] the . . . banks in their analysis of the proposed currency exchange

1 transaction" so that Cairn could "[o]btain feedback" and "select" a bank. App'x at

2 166, 169, 172. The NDA stated that the agreement would remain in effect for two

3 years. *Id.* at 167.

4       That month, Dipak Khot of HSBC pitched Cairn on several methods of

5 executing the FX transaction, including the full risk transfer and fix transaction

6 described above, as well as some methods (an "at best" price) where HSBC would

7 serve as a broker or agent for Cairn and be paid a commission. The parties disagree

8 on the extent to which the pitch should be read as "puffery" or "salesman's banter"

9 as opposed to binding promises about how HSBC would handle the trade if it

10 secured the contract. The presentation stated:

11     •    "We would like to execute this in the best interest of [Cairn]." App'x

12           at 177.

13     •    "HSBC would work with you to ensure best execution during the

14           day." *Id.* at 180.

15     •    "It is important to choose a reliable partner[] who has a track record

16           and ability to seamlessly execute a transaction of this magnitude

17           without creating excessive market volatility." *Id.* at 175.

1     •   "[I]t is in the interest of [Cairn] to manage the process jointly with

2         HSBC in case of undue market volatility." *Id*. at 177.

3   But it also said:

4     •   "[Cairn] should not rely on any information in the document." *Id*. at

5         204.

6     •   A fix would "fully expose[] [Cairn] to any adverse movements" and

7         is among "the riskiest of the strategies to consider." *Id*. at 178.

8     •   "Neither HSBC nor any of its affiliates are responsible for providing

9         [Cairn] with . . . specialist advice." *Id*. at 204.

10     •   "[Cairn] is solely responsible for making [its] own independent

11         appraisal of and investigation into the . . . transaction." *Id*.

12   While still considering which bank to move forward with, the Rothschild

13 partner advising Cairn spoke to Petitioner-Appellant Johnson about a fix

14 transaction and how it would be conducted. During the conversation Johnson

15 explained:

16     [L]et's say it's, for argument's sake, it's 11 o'clock. In a perfect world
17     we start at 9 and we, or 8 in the morning, and we gradually build it
18     up, build it up, build it up and then just try and control the market so
19     it doesn't look too noisy because obviously, you know our aim is to
20     make a small amount of money out of this clearly because that's our
21     business. But, you know, have a happy customer go away.

. . .

So if we just accumulate the position and then just try and control the market over the last 20 minutes, so that we give you a fair price and then we have something that you know, we keep Dipak and the bosses happy, . . . Then, then it's a win-win. If you've told us, you know, we need the fix in 30 minutes then we've got a lot to buy and we're gonna cause a lot of noise and we run the risk one of losing a lot and two of upsetting the customer. And that's just not in our interest.

App'x at 275.

The Rothschild advisor asked whether, if HSBC was able to buy the pounds at a price significantly better than the fix, it would be willing to share some of that profit with Cairn. Johnson said no and warned him that banks who offer a discount on the fix will just compensate by trading in a way that pushes up the fix:

Now if you're doing that clearly you're doing it cause you're intending to ramp the fix. . . . If we use the fix then we say actually we can do it 10 pips better than that fix[,] it then opens a whole other question[] as to why did you do it 10 pips better than the fix, you obviously ramped the fix. So where would it have been if you hadn't ramped the fix and it just opens up a whole load of stuff. The point of doing a fix is you basically look to buy the amount on average at or around that fix at that time, which, which minimizes the ability of you to really beat the fix by a really large amount anyway.

*Id.* at 277—78.

The parties have drastically different interpretations of this conversation.

According to the government, Johnson represented that HSBC would not trade in

1    a way that would ramp the fix. According to Johnson, he was informing Cairn and

2    Rothschild that HSBC would trade ahead of the fix which would naturally risk

3    causing upward pressure on the price of pounds, and that the shorter the window

4    the bank was given before the fix, the steeper the pressure would be. Johnson

5    further argues that he made clear that HSBC would seek to profit by beating the

6    fix.

7         In late October, Cairn awarded the contract to HSBC. The parties signed a

8    Mandate Letter in which they agreed that HSBC would sell pounds to Cairn on a

9    principal-to-principal basis, but the agreement left open the exact method to be

10   chosen. If a fix were chosen, the agreement required Cairn to inform HSBC of the

11   full amount needed at least two hours before the chosen fix time.

12        The Mandate Letter also included a number of disclaimers. It stated:

13       HSBC is not responsible for providing the recipient with legal, tax, or
14       other specialist advice and the recipient should make its own
15       arrangements accordingly. The recipient is solely responsible for
16       making its own independent appraisal of and investigation into the
17       products, investments, and transactions referred to in this document
18       and should not rely on the information in this document as
19       constituting investment advice.
20       . . .
21       The issue of this document shall not be regarded as creating any form
22       of advisory or other relationship, and HSBC may only be regarded as
23       acting on behalf of the recipient as financial advisor or otherwise

following the execution of an engagement letter on mutually
satisfactory terms.

*Id.* at 211.

The Mandate Letter also incorporated an International Swap Dealers

Association Master Agreement (ISDA) previously signed by the parties. The ISDA

stated in relevant part:

> Each party will be deemed to represent to the other party on the date
> on which it enters into a Transaction that . . . :
> *Non reliance*. It is acting for its own account and it has made its own
> independent decisions to enter into that Transaction and as to
> whether that Transaction is appropriate or proper for it based upon
> its own judgment and upon advice from such advisers as it has
> deemed necessary.
> . . .
> *Status of the Parties*. The other party is not acting as fiduciary for or as
> an adviser to it in respect of that Transaction.

*Id.* at 261.

Cairn kept the exact timing and amount of the transaction close to its chest.

It did not inform even HSBC for fear of influencing the market. But the fact of the

transaction—that Cairn was in the process of selling a major subsidiary, the deal

would be conducted in dollars, Cairn would conduct a major foreign exchange

transaction, and then it would distribute most of the proceeds to its shareholders

in pounds—was public before the RFP process was even held, and the NDA did

1    not purport to apply to this publicly available knowledge.

2                              *Execution of the Trade*

3          After the Mandate Letter was signed but before the transaction date,

4    Johnson purchased pounds in his proprietary trading book on behalf of HSBC. On

5    December 7, 2011, at 1:56 PM, Cairn officially placed its order with HSBC for 1.2

6    billion pounds at the 3:00 PM fix rate. At 2:28 PM, Cairn increased its order to

7    approximately 2.25 billion pounds. Johnson responded to the news of the

8    increased order with, "fucking Christmas!" Johnson was in New York on

9    December 7, so he delegated the responsibility of overseeing the trade to Stuart

10   Scott, an HSBC trader in London. Scott supervised Frank Cahill, another HSBC

11   trader in London who was tasked with buying the pounds to fill Cairn's order.

12   Cahill testified that he didn't receive any direct instruction from Johnson about

13   how to trade, and he went about it as he normally would: some "aggressive"

14   methods that would ramp the price, followed by pauses to let the market breathe

15   and minimize upward movement.

16         At 2:54 PM, Johnson learned that HSBC was still 1.2 billion pounds short of

17   the 2.25 billion needed. He spoke with Scott by phone, and again the parties have

different interpretations of this conversation. The relevant portions of the call are

as follows:

> JOHNSON: Just uh, the email I sent to Dipak [Khot]. So we should
> use that as reference rate, right? So to, I mean obviously, we've got a
> bit of a way to go, right. But I don't know what his average is but as
> long as it is under that rate, they can't really complain. Right?
> SCOTT: Yeah, yeah.
> JOHNSON: If it's over 5730 they're gonna squeal.
> SCOTT: If it's over what?
> JOHNSON: If it's over fifty—well if it's—it was around 5630 when
> they called us, right, and it spent most of the morning around 5620-
> 30 so we should probably make sure we don't ramp it up through
> there.

App'x at 236.

Johnson then told Scott that they could "afford to go short some," that is,

either sell some pounds to prevent the price from being ramped above 5730 or stop

short of purchasing 2.25 billion pounds and fulfill the order from HSBC's

proprietary account.[1] According to the government, Johnson and Scott were

strategizing about how much they could ramp up the price before Cairn would

complain. According to Johnson, he was warning Scott against ramping up the

price too high and specifically advising him to keep the price below that of a full

risk transfer, which had been the other FX strategy Cairn had seriously considered.

---

[1] "5730" in this context refers to an exchange rate of 1.5730 British Pounds to U.S. dollars.

1     Cahill purchased 1.2 billion pounds in the final six minutes before 3:00 PM.

2     The price of the pound increased and reached its highest point of the day at the

3     3:00 PM fix. Following the transaction, Cairn expressed concern about the spike in

4     price. Cairn asked to speak with Johnson and Scott. Before the call, Khot warned

5     Johnson "to be a bit careful if it's us." Supp. App'x at 135. On the phone, Scott told

6     Cairn that such spikes were pretty normal and said that the Russian Central Bank

7     had also been buying pounds at that time. Johnson chimed in saying that the

8     Russians were "always selling dollars." Supp. App'x at 147.

9     Before Cairn placed its order on December 7, Johnson, from New York, had

10    sent the following message to Paul Clark, an HSBC trader in London: "I left my

11    watch in the hotel, have to go and get it . . . ." Supp. App'x at 219. The government

12    argues that Johnson used "watch" as a code word, in fact, as a tip to buy pounds.

13    In any event, Clark and several other HSBC traders began buying pounds shortly

14    after Johnson's message. Many, but not all, of these pounds were used to fulfill

15    Cairn's order. The remaining pounds were sold shortly after 3:00 PM to third

16    parties, when the price of pounds was at its peak for the day, earning much money

17    for HSBC's proprietary books.

1    HSBC ultimately decided to give Cairn a discount of 2.5 pips. HSBC's total

2    profits from the transaction were around $7 million. Johnson asserts that the

3    transaction cost Cairn significantly less than the full-risk transfer would have cost

4    and that HSBC's "commission" on the deal amounted to 0.2% of the $3.5 billion

5    transaction.

6                                    *Procedural Background*

7        In 2016, Johnson was indicted on one count of conspiracy to commit wire

8    fraud in violation of 18 U.S.C. § 1349 and 10 counts of wire fraud in violation of 18

9    U.S.C. § 1343. Johnson's four-week trial began in late 2017.

10       At trial, the government advanced two theories of wire fraud. Under the

11   misappropriation theory, the government argued that Johnson breached a duty to

12   Cairn by using Cairn's confidential information to make proprietary trades prior

13   to the fix in a way that ramped the price for Cairn and made profit for HSBC.

14   Under the right-to-control theory, the government argued that Johnson, after

15   misleadingly representing to Cairn that HSBC would not ramp up the price of the

16   pound, intentionally ramped the fix, depriving Cairn of pricing information that

17   went to the core of the deal.

1    The jury found Johnson guilty on one count of conspiracy and eight counts

2    of wire fraud in a general verdict that did not specify upon which theory of liability

3    it relied. The district court sentenced Johnson to 24 months' imprisonment, three

4    years of supervised release, and a $300,000 fine. On appeal, this Court upheld

5    Johnson's conviction on the right-to-control theory, expressly deciding "not [to]

6    reach Johnson's arguments as to the misappropriation theory." *Johnson*, 945 F.3d

7    at 608.

8    As Johnson was completing his sentence, the Supreme Court invalidated the

9    right-to-control theory of fraud. *Ciminelli v. United States*, 598 U.S. 306 (2023).

10    Shortly thereafter, Johnson filed this Petition for coram nobis with his sentencing

11    court. The district court rejected his Petition, concluding that "the jury would have

12    found that Johnson met each of the elements required under the misappropriation

13    theory." *Johnson*, 2024 WL 1740916 at *12. As a result, it found that the inclusion of

14    the invalid right-to-control theory in the jury charge was harmless.

15                                      **DISCUSSION**

16    Coram nobis, the common law writ used to correct errors "of the most

17    fundamental character" after a final conviction and exhaustion of all appeals, is an

18    "extraordinary remedy" to be used only where "circumstances compel[] such

1  action to achieve justice." *United States v. Morgan*, 346 U.S. 502, 511–12 (1954)

2  (citation and quotation marks omitted). In this Circuit, we have said that the writ

3  should issue when a petitioner shows "1) there are circumstances compelling such

4  action to achieve justice, 2) sound reasons exist for failure to seek appropriate

5  earlier relief, and 3) the petitioner continues to suffer legal consequences from his

6  conviction that may be remedied by granting of the writ." *Kovacs v. United States*,

7  744 F.3d 44, 49 (2d Cir. 2014).

8  Nobody disputes that Johnson filed his Petition at his earliest possible

9  opportunity.[2] And, as the district court found, Johnson continues to suffer legal

10  consequences from his conviction in the form of restrictions on his ability to work

11  in banking and to travel to this country. *Johnson*, 2024 WL 1740916, at *6 n.14. The

12  only question before us on appeal is, therefore, the main one—whether justice

13  compels issuance of the writ.

14  **I.  A Possible *Yates* Error**

15  When a jury is presented with an illegal or unconstitutional basis for

16  conviction and a legally valid basis, a so-called *Yates* error arises if the jury returns

---

[2] Johnson filed this Petition 75 days after the Supreme Court handed down its decision in *Ciminelli* and 72 days after he was released from prison.

1 a general verdict and a court cannot determine upon which basis the jury

2 convicted. *Griffin v. United States,* 502 U.S. 46, 56 (1991). If Johnson were still

3 imprisoned, he would be able to seek habeas relief on the grounds that his jury

4 was invited to convict him on a legally invalid basis, the right-to-control theory,

5 alongside the legally valid misappropriation theory.[3] Similarly, if his case were

6 still on direct appeal, Johnson could have argued that a *Yates* error here required

7 reversal of his conviction. *See United States v. Garcia*, 992 F.2d 409, 416 (2d Cir.

8 1993). As a result, the possibility that Johnson's jury convicted him for behavior

9 "that simply is not illegal" is adequate to support his claim that justice requires the

10 issuance of coram nobis. *United States v. Mandanici*, 205 F.3d 519, 525 (2d Cir. 2000)

11 (quotation marks omitted).

12    But *Yates* errors are not structural and are subject to harmlessness review.

13 *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008). The district court denied Johnson's

14 Petition because it determined "that including the invalid right-to-control theory

---

[3] It is unimportant that Johnson was convicted before the Supreme Court's determination in *Ciminelli* that the right-to-control theory is "invalid," 598 U.S. at 317, because that decision created a new rule of substantive criminal law. "A new rule of substantive criminal law is presumptively retroactive because a defendant may have been punished for conduct that simply is not illegal." *United States v. Mandanici*, 205 F.3d 519, 525 (2d Cir. 2000) (quotation marks omitted).

1  [did not affect] the verdict's outcome" and therefore was harmless. *Johnson*, 2024

2  WL 1740916, at *7. It is to that question we now turn.

3  **II.  Harmlessness Review in Coram Nobis**

4  This Court has never squarely stated which standard of harmlessness

5  review applies in coram nobis. In recognition of the extraordinary nature of coram

6  nobis relief and the interest of finality, the government urges us to apply the so-

7  called *Kotteakos* standard used for collateral review of state court convictions.

8  Under that standard, the government must show the error did not have

9  "substantial and injurious effect or influence in determining the jury's verdict."

10  *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). Johnson instead urges us to apply

11  the *Chapman* standard used for initial review of constitutional errors. Under

12  *Chapman*, the government must demonstrate that the error "was harmless beyond

13  a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

14  We note that the concerns about comity, federalism, and state interests cited

15  by the Supreme Court for preferring *Kotteakos* in collateral review are not present

16  in this case, where the Petitioner asks us to overturn a federal conviction

17  originating in this Circuit. *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993). We note

18  also that under both *Chapman* and *Kotteakos* the government bears the  burden of

1 persuasion. *Id.* at 630 ("The State bears the burden of proving that an error passes

2 muster under [the *Chapman* reasonable doubt] standard."); *O'Neal v. McAninch*,

3 513 U.S. 432, 438–39 (1995) (stating the same for the *Kotteakos* substantial-influence

4 standard).

5      In the end, however, because Johnson prevails under either standard, we

6 decline to decide in this case which harmlessness test is more appropriate for

7 coram nobis. And we hold that the government has not met its burden under the

8 less burdensome *Kotteakos* standard.

9 **III.   Weaknesses of the Misappropriation Case against Johnson**

10      The issue before us is whether the inclusion of the misappropriation theory

11 in the jury instructions renders harmless the inclusion of the invalid right-to-

12 control theory. We are unconvinced by the government's argument that Johnson's

13 jury was not substantially influenced by the inclusion of the invalid right-to-

14 control theory. Indeed, as to least two elements of the misappropriation theory,

15 the government's case was so weak that we find ourselves doubting that a jury

16 would have convicted Johnson on that basis.

17      To convict on the misappropriation theory, the jury needed to find four

18 elements beyond a reasonable doubt: "(1) the Defendant entered into a

1    relationship of trust and confidence with Cairn; (2) Cairn provided the Defendant

2    with confidential information in the course of such a relationship; (3) the

3    defendant . . . secretly used that information for his own benefit, under

4    circumstances where that use could or did result in a tangible harm to Cairn; and

5    (4) the defendant acted with knowledge and fraudulent intent." *Johnson*, 2024 WL

6    1740916 at *7 (citation and quotation marks omitted). On the first element, which

7    we call the fiduciary relationship element, and the third, which we call the

8    misappropriation element, the government's evidence was decidedly weak.

9            *A.  The Fiduciary Relationship Element*

10           A    person   can   only   commit   fraud   by   misappropriation   if   they

11   misappropriate confidential information from a person or entity with which they

12   have a pre-existing fiduciary or quasi-fiduciary relationship. *See United States v.*

13   *Chestman*, 947 F.2d 551, 570–71 (2d Cir. 1991) (en banc). A person acts as another's

14   fiduciary when "the business which he transacts, or the money or property which

15   he handles, is not his own or for his own benefit, but for the benefit of" the other.

16   *Id*. at 568 (quoting Black's Law Dictionary 564 (5th ed. 1979)). This fiduciary

17   relationship cannot be "lightly implied," and a customer's placing "great

18   confidence and trust" in their broker is insufficient. *United States v. Skelly*, 442 F.3d

1   94, 98–99 (2d Cir. 2006). Rather, a fiduciary relationship requires "de facto control

2   and dominance" by the agent over the principal's affairs. *Id.* (citation and

3   quotation omitted).

4   　　In his defense, Johnson pointed to the Mandate Letter and its incorporation

5   of the ISDA disclaiming any fiduciary relationship between HSBC and Cairn. As

6   a result he asserts that, as a matter of law, he had no fiduciary duty to Cairn.

7   During Johnson's trial, the district court acknowledged that whether the fiduciary

8   duty element was a question of law or an issue of fact was a "knotty issue." The

9   court ultimately decided that this element presented an issue of fact for the jury.

10  Where the dispute over the existence of a fiduciary relationship is based in factual

11  questions, like who promised what to whom, it is of course the provenance of the

12  jury to decide those facts. Here, the dispute was not so much *what* was promised

13  as *which* promises were controlling.

14  　　We do not, however, conclude that the district court was incorrect to allow

15  the jury to decide the fiduciary duty element. It is legally possible for a person to

16  form a *de facto* fiduciary relationship notwithstanding a purported contractual

17  disclaimer of such a relationship. But the evidence for such a fiduciary relationship

18  would need to be quite strong and the jury charge quite clear. And the explicit

1    disclaimer of fiduciary liability and the absence of any contractual breach carry

2    quite a lot of weight.

3        A factfinder in such a situation must begin from the presumption that no

4    fiduciary relationship exists, and only the strongest parol evidence that a

5    defendant deliberately created a quasi-fiduciary relationship can suffice to

6    override that presumption. Significantly, in the different but similar context of

7    honest-services fraud, the Supreme Court recently found that this Court violated

8    a defendant's Due Process rights when we affirmed a jury instruction that allowed

9    the jury to impute a fiduciary duty to the public from a finding that a defendant

10   "dominated and controlled" government business and had a "special

11   relationship" to the government even when that defendant had no official public

12   position. *Percoco v. United States*, 598 U.S. 319, 322 (2023). The Supreme Court

13   explicitly did not say that a formal public position is the *only* way to assume a

14   fiduciary duty to the public, but the Supreme Court made clear that in the absence

15   of such a position, a fiduciary relationship should not be lightly implied from

16   vague principles. The same also must be true for a defendant with no explicit,

1    contractually binding fiduciary relationship with his purported victim.[4]

2         All in all, we find it unlikely that a reasonable jury would have reached

3    unanimous agreement on the fiduciary duty element here.

4              *B. The Misappropriation of Confidential Information Element*

5         To create fraud liability, it is not enough for a defendant, without full

6    disclosure, to appropriate another's confidential information. A defendant must

7    *mis*appropriate that information—that is, use it in a way that was not permitted—

8    for their own benefit and to the detriment of the other. The case against Johnson

9    on this element is far from straightforward.

10        The district court was correct that it is not theoretically impossible to prove

11   misappropriation fraud, which is typically used to prosecute securities fraud, also

---

[4] The government appears at times to argue that the NDA counteracted the contractual disclaimer in some way and created an independent fiduciary duty. But "[a] mutual nondisclosure agreement does not *per se* create a fiduciary relationship." *Converged Compliance Sols., Inc. v. XOP Networks, Inc.*, No. 21-CV-5482 (PGG) (OTW), 2024 WL 4665114, at *18 (S.D.N.Y. Sept. 25, 2024) (citing *Gate Technologies, LLC v. Delphix Capital Mkts., LLC*, 12-CV-7075 (JPO), 2013 WL 3455484, at *8 (S.D.N.Y. July 9, 2013)). And both this Court and the District Court implicitly found that Johnson had committed no contractual breach. *Johnson*, 945 F.3d at 613 ("[The criminal fraud statute here] applies even if the parties' contract was never breached."); *Johnson*, 2024 WL 1740916, at *9 ("[A] defendant may commit wire fraud even absent a breach of contract when the defendant had an intent to defraud.").

As a result, we analyze the NDA as yet another piece of parol evidence pointed to by the government that Johnson intended to create a quasi-fiduciary relationship with Cairn notwithstanding the contract between the parties.

1  in the foreign transactions market. But when this form of liability is applied in this

2  new, foreign exchange context, the test must take into account the differences in

3  the markets. The government does not dispute that, unlike traders in stock, foreign

4  exchange dealers cannot simply abstain from the market when they receive

5  "inside" information. A foreign exchange dealer must buy and sell many millions

6  of pounds and dollars every day, even if it is a party to an upcoming fix

7  transaction. Indeed, a foreign exchange dealer engaged in a large fix transaction

8  *must* trade ahead of the fix to execute the deal and *can* further trade ahead, to some

9  disputable degree, to hedge against the risk of an unfavorable fix price. Insofar as

10  either the fact of the fix transaction or its timing is confidential, the foreign

11  exchange dealer uses confidential information in both cases.

12      The government never convincingly made out its theory that Johnson's use

13  of Cairn's information was misappropriative. Its evidence did not show Johnson's

14  behavior to be extra-ordinary, and thus *mis*-appropriative, in any of the above

15  respects. Indeed, the government's evidence showed that Cahill, the trader in

16  charge of executing the fix, conducted himself as he "normally" would. App'x at

17  133. This was important evidence for the government's right-to-control case, in

18  which it accused Johnson of misleading Cairn about the extent to which HSBC

1   would treat the deal as a normal fix transaction. But it undermines the

2   government's argument that Johnson used confidential information about the fix

3   in an abnormal and knowingly impermissible way.

4       As a result, we doubt that a properly instructed jury would have found the

5   government satisfied its burden of showing that Johnson misappropriated Cairn's

6   information.

7   **IV.     The Case for Grave Doubt**

8       With these concerns in mind, we must determine whether the presentation

9   of the erroneous right-to-control theory was harmless. The question before us is

10  not whether a jury *could* have or even *would* have convicted Johnson if presented

11  only with a misappropriation theory of fraud. It is, rather, whether Johnson's jury

12  *did* convict him on that basis.

13      The right-to-control case against Johnson was straightforward and that was

14  the only basis upon which his conviction was previously upheld by this Court.

15  The government's misappropriation theory, instead, was substantially more

16  complicated and had serious shortcomings. Given those circumstances, we find it

17  impossible to avoid grave doubt that the jury was "substantially swayed by" the

18  presentation of the invalid right-to-control theory alongside the misappropriation

1    theory. 328 U.S. at 765.

2       Much in this case was confusing or disputed, but the evidence was clear that

3    Johnson, immediately after the transaction, misled Cairn about why the 3:00 PM

4    fix price rose so much. From this, the jury was invited to infer that Johnson

5    intentionally ramped the 3:00 PM fix price, and we think that inference is strong.

6    It is also indisputable that Johnson led Cairn to believe that HSBC, unlike other

7    foreign exchange dealers the company was considering in the RFP process, would

8    not intentionally ramp the fix price. These facts created a textbook case of right-to-

9    control fraud, and the jury was invited to convict Johnson on that basis.

10       On the other hand, to convict on the misappropriation theory the

11    government needed to prove (1) that Johnson owed a fiduciary duty to Cairn,

12    despite the basic principal-to-principal structure of the deal and the contractual

13    disclaimers of such a duty, because Johnson had made statements inducing Cairn

14    to believe Johnson had assumed that duty, (2) that because of this fiduciary duty,

15    Cairn shared confidential information with Johnson, (3) that Johnson misused this

16    confidential information, intentionally buying more pounds than he could

17    reasonably need to fulfill the deal or hedge against risk for HSBC and then

18    intentionally ramped the price of pounds to Cairn's detriment, and (4) that

1    Johnson intended to defraud Cairn when doing all of the above.

2           Despite our doubts expressed earlier, it is not impossible that a reasonable

3    jury could find that the government proved all four of these elements beyond a

4    reasonable doubt. But that is not the test. And we find it highly unlikely that a

5    reasonable jury would have reached unanimous agreement on the more

6    complicated and contestable misappropriation theory when it had the right-to-

7    control theory as an available alternative. Indeed, we find ourselves—at the very

8    least—in "virtual equipoise" as to whether any jury, presented only with the

9    misappropriation theory, would convict Johnson. *O'Neal*, 513 U.S. at 435. That is

10   more than enough to leave us with grave doubt.

11                                   **CONCLUSION**

12          We therefore **REVERSE** the judgment of the district court and **REMAND**

13   for entry of an order granting the Petition.